**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

RAQUEL ERNEST,                                     Case No.

                          Plaintiff,               **COMPLAINT**

              -against-
                                                   **Jury Trial Demanded**
TASTES ON THE FLY NEW YORK, LLC d/b/a
PARIS CAFE, MARCO PALUMBO, and
SIMANTINI RAMNARINE,

                          Defendants.
-------------------------------------------------------------X

Plaintiff Raquel Ernest ("Ernest" or "Plaintiff") alleges against Defendants Tastes on the

Fly New York, LLC d/b/a Paris Cafe ("Paris Cafe"), Marco Palumbo ("Palumbo"), and Simantini

Ramnarine ("Ramnarine") (collectively, "Defendants") upon information and belief, as follows:

## NATURE OF THE CLAIMS

1.      Ernest complains pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e, *et seq.*, ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290,

*et seq.*, ("NYSHRL"), and the New York City Human Rights Law, N.Y. Admin. Code § 8-101, *et*

*seq.*, ("NYCHRL"), seeking damages to redress the lost wages, emotional distress, and other harms

she suffered and continues to suffer as a result of being discriminated against and subjected to a

discriminatory hostile work environment by her employer on the basis of her **race and color** and

retaliated against by her employer after opposing and complaining of discrimination.

2.      The Federal, New York State, and New York City anti-discrimination and anti-

retaliation laws are intended to afford all employees the same rights, regardless of their race and

color, and provide them with the dignity and respect they deserve in the workplace.  As such, this

is an action for declaratory and monetary relief to redress Defendants' unlawful employment practices, including the unlawful discrimination and retaliation committed against Plaintiff.

3.      Plaintiff further alleges battery under New York State common law against Paris Cafe, as a result of the intentional, non-consensual, harmful and offensive physical contact to which an employee of Paris Cafe subjected Plaintiff.

## JURISDICTION AND VENUE

4.      This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4).  This Court has supplemental jurisdiction over Plaintiff's claims under city and state law pursuant to 28 U.S.C. § 1367(a), in that the city, state, and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

6.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF REMEDIES

7.      On or about June 6, 2024, Plaintiff duly filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge Number 520-2024-05721.

8.    On or about September 14, 2024, the EEOC terminated its processing of the Charge of Discrimination—making no determination on the merits of the Charge—and issued Plaintiff a Notice of Right to Sue.

9.    Plaintiff has exhausted her administrative remedies and files this Complaint within 90 days of the EEOC's issuance of her Notice of Right to Sue, satisfying all procedural prerequisites for bringing this action.

## PARTIES

**Plaintiff Raquel Ernest**

10.    At all times relevant to this action, Ernest was and is a resident of Kings County, New York.

11.    Ernest is a dark-skinned, African-American woman.

12.    On or around May 1, 2019, Ernest first commenced employment with Paris Cafe. During and due to the Coronavirus pandemic, Paris Cafe was closed.  In or around April 2021, Ernest returned to work at Paris Cafe, where she remains employed.

13.    From at least in or around April 2021, until in or around December 2022, at Paris Cafe, Ernest worked under the direct supervision of, and was in a subordinate position to, Palumbo.

14.    From in or around August 2023, until in or around the end of November 2023, at Paris Cafe, Ernest worked under the direct supervision of, and was in a subordinate position to, Ramnarine.

15.    For the duration of her employment with Paris Cafe, Ernest reported to the Paris Cafe restaurant located within John F. Kennedy International Airport, at 1 Idlewild Drive, Queens, New York 11430.

16. For the duration of her employment with Paris Cafe, Ernest was an employee of Paris Cafe within the meaning of all applicable statues.

**Defendant Tastes on the Fly New York, LLC d/b/a Paris Cafe**

17. At all times relevant to this action, Paris Cafe was and is a domestic limited liability company organized and existing under and by virtue of the laws of the State of New York.

18. At all times relevant to this action, Paris Cafe was and is a domestic for-profit entity authorized to operate in the State of New York.

19. At all times relevant to this action, Paris Cafe operated as a restaurant in the TWA Hotel at John F. Kennedy International Airport, from which they sold food and drink to the public.

20. At all times relevant to this action, Paris Cafe maintains its principal place of business at the premises designated and/or more commonly known as 1 Idlewild Drive, Queens, New York 11430.

21. For the duration of Ernest's employment with Paris Cafe, Paris Cafe operated the restaurant location at 1 Idlewild Drive, Queens, New York 11430, at which Ernest worked during her employment with Paris Cafe.

22. For the duration of Ernest's employment with Paris Cafe, Paris Cafe employed fifteen (15) or more employees.

23. At all times relevant to this action, Paris Cafe was an employer of Ernest within the meaning of all applicable statutes.

**Defendant Marco Palumbo**

24. Upon information and belief, at all times relevant to this action, Palumbo was and is a resident of the State of New York.

25. Palumbo is a light-skinned, Caucasian man.

26. From at least approximately in or around April 2021, until in or around December 2022, Palumbo was employed by Paris Cafe as a General Manager.

27. For the duration of Ernest's and Palumbo's concurrent employment with Paris Cafe, Palumbo was in a position superior to Ernest with respect to their employment at Paris Cafe.

28. For the duration of Ernest's and Palumbo's concurrent employment with Paris Cafe, Palumbo possessed and exercised supervisory authority over Ernest.

29. In his capacity as a General Manager for Paris Cafe, during Ernest's and Palumbo's concurrent employment with Paris Cafe, the supervisory authority Palumbo possessed and exercised over the terms and conditions of Ernest's employment included, but was not limited to: the authority to hire and fire Ernest, discipline her, direct her work activities, assign her job responsibilities, monitor and evaluate her performance, set and modify her work schedule, implement and enforce Paris Cafe's policies governing Ernest's employment, and otherwise control the terms and conditions of Ernest's employment with Paris Cafe.

30. At all times relevant to this action, the supervisory authority Palumbo possessed and exercised over Ernest's employment with Paris Cafe was vested in Palumbo by Paris Cafe.

31. At all times relevant to this action, Palumbo was an employee of Paris Cafe within the meaning of all applicable statutes.

32. At all times relevant to this action, Palumbo, as Ernest's supervisor, was an employer of Ernest within the meaning of the NYSHRL and NYCHRL.

**Defendant Simantini Ramnarine**

33. Upon information and belief, at all times relevant to this action, Ramnarine was and is a resident of the State of New York.

34. Ramnarine is a light-skinned, non-African American woman.

35. Upon information and belief, Ramnarine of South Asian descent.

36. From in or around August 2023, until in or around the end of November 2023, at Paris Cafe, Ramnarine was employed by Paris Cafe as a General Manager.

37. For the duration of Ernest's and Sam's concurrent employment with Paris Cafe, Ramnarine was in a position superior to Ernest with respect to their employment at Paris Cafe.

38. For the duration of Ernest's and Sam's concurrent employment with Paris Cafe, Ramnarine possessed and exercised supervisory authority over Ernest.

39. In her capacity as a General Manager for Paris Cafe, during Ernest's and Ramnarine's concurrent employment with Paris Cafe, the supervisory authority Ramnarine possessed and exercised over the terms and conditions of Ernest's employment included, but was not limited to: the authority to hire and fire Ernest, discipline her, direct her work activities, assign her job responsibilities, monitor and evaluate her performance, set and modify her work schedule, implement and enforce Paris Cafe's policies governing Ernest's employment, and otherwise control the terms and conditions of Ernest's employment with Paris Cafe.

40. At all times relevant to this action, the supervisory authority Ramnarine possessed and exercised over Ernest's employment with Paris Cafe was vested in Ramnarine by Paris Cafe.

41. At all times relevant to this action, Ramnarine was an employee of Paris Cafe within the meaning of all applicable statutes.

42. At all times relevant to this action, Ramnarine, as Ernest's supervisor, was an employer of Ernest within the meaning of the NYSHRL and NYCHRL.

## **FACTUAL ALLEGATIONS**

43. On or around May 1, 2019—prior to the opening of the restaurant to the public— Ernest commenced employment with Paris Cafe.

44.    For the duration of her employment with Paris Cafe, Ernest held, and continues to hold, the position of server.

45.    In her capacity as a server, Ernest's duties and responsibilities include, but are not limited to: greeting guests, taking food and drink orders, running food and drink orders to tables, and ensuring the restaurant is kept clean and presentable.

46.    In addition to her usual server duties and responsibilities, due to Paris Cafe's needs, Ernest is frequently called upon to perform bartending duties, such as preparing drinks for patrons.

47.    At all times relevant to this action, Ernest was and is qualified for the position of server.

48.    For the duration of her employment with Paris Cafe, Ernest has satisfactorily performed her duties and responsibilities.

49.    Since her hire, Ernest has reported to work at the restaurant, located within John F. Kennedy International Airport, at 1 Idlewild Drive, Queens, New York 11430.

50.    In or around April 2021, Ernest returned to work at Paris Cafe.

51.    When she returned, Ernest was subject to the supervision of Palumbo, then-General Manager of the restaurant.

**Race and Color-Based Discrimination and Retaliation**

52.     Beginning in or around April 2021, Paris Cafe subjected Ernest to discriminatory abuse and disparate treatment on the basis of her race and color.

53.    Paris Cafe also subjected Atalie Pemberton ("Pemberton"), one of few other African-American servers employed by Paris Cafe, to race- and color-based discrimination.

54.    In addition to its discriminatory treatment of its African-American employees, Paris Cafe discriminatorily and disparately treats its African-American customers.

55. Among other discriminatory conduct, Paris Cafe segregates its African-American customers, separating them from other customers and seating them in the back of the restaurant.

56. On several occasions during Ernest's employment with Paris Cafe, she raised her concerns about Paris Cafe's treatment of African-American customers with her supervisors. However, her complaints were dismissed and ignored.

57. For example, non-African-American servers, including Gahari Chen Chen ("Chen"), a South Asian server, and Candice Bailey ("Bailey"), a Hispanic server, overtly discriminate against Paris Cafe's African-American customers.

58. On a regular basis during Ernest's and Chen's concurrent employment with Paris Cafe, Chen joked about Black people liking Hennessy—an alcoholic beverage stereotypically associated with the African-American community.

59. On one occasion, Ernest observed Chen—repeatedly and without request—tell a table of African-American customers the price of each alcoholic drink they ordered.

60. It was not a customary practice of Paris Cafe servers to repeatedly state the price of each drink ordered by a customer.

61. Before this incident, Ernest had never heard Chen tell a non-African-American customer the price of a drink.

62. Ernest approached Chen and asked him why he told the guests the price of each drink as they gave him their order.

63. Chen responded, **"You know how the black people are. When they get the bill, after, they get upset about the prices. You know how they order the Hennessey and get upset when they get the bill."**

64. Ernest was stunned and appalled by Chen's brazenly racist perception and treatment of African-Americans.

65. Ernest complained of the racist comments to the Floor Manager—Gary [last name currently unknown] ("Gary"), who is South Asian, and to then-General Manager Palumbo, who is Caucasian.

66. However, neither Gary nor Marco took any action in response to Ernest's complaint.

67. On another occasion, in or around the fall of 2021, two of Ernest's regular customers—Mr. Ken and Ms. Vanessa, an older African-American couple—asked Gary to be seated in Ernest's section.

68. Gary denied their request and told Mr. Ken and Ms. Vanessa that he would get them a "better server".

69. A few days later, Mr. Ken and Ms. Vanessa approached Ernest and complained that Gary denied their request to be served by Ernest, and that Chen subjected them to sexual jokes, making them feel uncomfortable.

70. Ernest—who was not previously aware that Gary denied Mr. Ken and Ms. Vanessa's requests to be served by her—informed the guests that if they wished, they could raise their complaints with Palumbo.

71. Upon information and belief, the guests complained to Palumbo, but nothing was done.

72. Bailey has engaged in overtly discriminatory, racist conduct towards African-American customers.

73. By way of example, Bailey has told Paris Cafe hosts not to seat African-American customers in her section because, **"Black guests are cheap."**

74. By way of further example, when a host is in the process of seating an African-American guest in the front of the restaurant, Bailey has intervened to redirect the guest to the back of the restaurant.

75. On one occasion, a customer expressed concern to Ernest about the apparent racial segregation of customers at Paris Cafe.

76. Specifically, the customer approached Ernest and, pointing to the back of the restaurant (where all of the Black customers were located) said to her, "What—is this the Black section?"

77. Ernest raised the customer's concerning comment to Palumbo.

78. Palumbo took no action in response.

79. The customer—who had previously eaten at Paris Cafe on multiple occasions—never returned.

80. On or around January 13, 2024—Ernest was standing next to current Assistant General Manager Jadine [last name currently unknown] ("Jadine") and said, "Take a look around," while gesturing to the restaurant seating.

81. Ernest highlighted to Jadine that despite empty tables throughout the restaurant, the only three tables of African-American customers were seated adjacent to each other, in the back, and customers of other races (primarily Caucasian) were seated in the front.

82. Ernest reiterated her complaint to Jadine that the hosts continued to seat African-American customers in the back of the restaurant.

83. After and despite Ernest's multiple complaints about the racially discriminatory seating of customers at the restaurant, Paris Cafe continued to avoid seating African-American customers in the front of the restaurant, within public view.

84. In addition to the rampant racist and discriminatory conduct Paris Cafe inflicted upon its customers, the few African-American Paris Cafe employees—including Ernest—were subjected to discrimination because of their race and color.

85. Other than Ernest and Pemberton, Paris Cafe employed few other African-Americans at the server position.

86. Paris Cafe's workforce was (and continues to be) primarily Hispanic and South Asian.

87. Since the commencement of Ernest's employment with Paris Cafe, Paris Cafe has employed few African-Americans in supervisory, managerial, or executive roles—including in Human Resources ("HR").

88. The lack of African-American leadership at Paris Cafe allowed the discriminatory work environment to take hold and fester and played a significant role in Ernest's initial reticence to complain about the discriminatory treatment she experienced.

89. Upon Ernest's return to Paris Cafe after the Coronavirus pandemic, Ernest was supervised by Palumbo.

90. Palumbo treated Ernest and Pemberton materially worse than our less experienced, poorer performing, non-African-American colleagues.

91. Upon information and belief, many of the non-African-American, light-skinned Paris Cafe employees receiving preferential treatment were **stealing from the company**.

92.     These employees were actively shielded from consequences and, in some cases, **rewarded** by Palumbo, at the expense of Ernest and Pemberton.

93.     During Palumbo's supervision of Ernest, Paris Cafe had a policy to assign shifts and schedules based upon seniority.

94.     Despite this policy, Palumbo took shifts away from Ernest and Pemberton and assigned them to less senior, non-African-American employees, including Bailey and Karma Namdol ("Namdol"), a South Asian server.

95.     During Palumbo's supervision of Ernest and Pemberton, Palumbo discriminatorily cut their shifts from five to three per week, reassigning those shifts to Bailey and Namdol.

96.     As a result of Palumbo's discriminatory reassignment of Ernest's and Pemberton's shifts, Bailey and Namdol were working **more shifts and hours** than Ernest and Pemberton were prior to Palumbo's cuts.

97.     While Ernest and Pemberton had been scheduled for five shifts, after Palumbo's discriminatory reassignment, they were working approximately three shifts per week.

98.     The addition of Ernest's and Pemberton's shifts gave Bailey and Namdol at least six scheduled shifts per week, including double and triple shifts.

99.     When Palumbo reassigned shifts from Ernest and Pemberton to Bailey and Namdol, Ernest and Pemberton had more seniority than Bailey and Namdol.

100.    When Palumbo reassigned shifts from Ernest and Pemberton to Bailey and Namdol, Ernest and had not requested a reduction in their hours.

101.    Throughout Ernest's employment with Paris Cafe, Ernest routinely volunteers to cover for other servers who call out.

102.    Palumbo's discriminatory, unwarranted reduction in Ernest's and Pemberton's shifts resulted in them working (and receiving compensation for) significantly fewer hours per week, which also caused a reduction in tips and opportunities to receive tips.

103.    In addition to discriminatorily cutting and reassigning shifts from Ernest and Pemberton, Paris Cafe discriminatorily allowed Stephanie Villada ("Villada"), a Hispanic supervisor, to participate in the tip pool.

104.    Although Villada was not permitted to participate in the tip pool, Palumbo called Grace Cha ("Cha"), HR Senior Director and—explaining that Villada had been extremely helpful—advocated for Villada to be permitted to participate in the tip pool.

105.    Paris Cafe agreed, and Villada participated in the tip pool.

106.    Villada's impermissible and unlawful participation in the tip pool reduced Ernest's (and the other servers') share of the tips to which they were entitled.

107.    Upon information and belief, among other Paris Cafe employees, Bailey and Villada were implicated in schemes to steal from Paris Cafe.

108.    Bailey's alleged scheme involved using the manager's card to void customer checks, accepting customer payments, and keeping the customer payments for herself.

109.    Villada's alleged scheme included stealing bottles of alcohol from Paris Cafe.

110.    Upon information and belief, Palumbo was aware of (if not an active participant in) both theft schemes.

111.    Although Ernest and Pemberton were upstanding and honest, until he was forced to leave Paris Cafe in or around December 2022, Palumbo continued to subject Ernest and Pemberton to discriminatory disparate treatment while covering for and protecting the non-African-American employees who were purportedly actively stealing from Paris Cafe.

112.    By way of example, Palumbo was responsible for posting the positive customer reviews received by Paris Cafe servers in the WhatsApp group message.

113.    While Palumbo posted every positive customer review for Bailey, Namdol, and Rasel—another South Asian server—Palumbo almost never posted any of the many positive customer reviews received by Ernest or Pemberton.

114.    On one occasion, Cha visited the restaurant and praised Pemberton for her performance, noting that she was receiving many positive reviews from customers.

115.    Pemberton was surprised and perplexed, as she had no idea she was receiving positive customer reviews.

116.    Cha confronted Palumbo, asking him why Pemberton did not know she received positive customer reviews.

117.    Palumbo lowered his head and admitted that he had not told Pemberton about her positive reviews.

118.    Ernest attempted to complain to Palumbo about the preferential treatment Chen and Namdol received and the discriminatory comments made by Chen.

119.    When Ernest first raised her complaints, she elected to complain to Palumbo instead of to HR directly, because Ernest was afraid of retaliation if she bypassed Palumbo.

120.    Addressing the discriminatory conduct with Palumbo, Ernest asked him to bring her concerns to HR.

121.    Approximately one month after Ernest's complaint of discrimination to Palumbo, without any communication from HR regarding her complaint, Paris Cafe issued **both Chen and Ernest** a "coaching/counseling" write-up.

122. Ernest protested and refused to sign the overtly retaliatory write-up, noting that she was the complainant and had not done anything wrong. In refusing to sign the write-up, Ernest further noted that HR never spoke with her about any purported wrongdoing (or at all, after her initial complaint) prior to issuing her the write-up.

123. Palumbo was not the only Paris Cafe supervisor who subjected Ernest and Pemberton to discriminatory disparate treatment because of their race and color.

124. Because of their race and color, Ray Russo ("Russo"), Paris Cafe's Executive Chef, Caucasian, singled out Ernest and Pemberton for hypercriticism and abuse.

125. By way of example, whenever Ernest or Pemberton made a minor error, Russo screamed at them and held their tickets, causing delays the customers attributed to Ernest and Pemberton, rather than the kitchen.

126. Even though other non-African-American servers made similar errors more frequently, Russo never yelled at the offending servers and rarely held their tickets.

127. Ernest repeatedly complained to Palumbo that Russo was treating her and Pemberton worse than the non-African-American servers and requested that he bring her complaints to HR.

128. However, Palumbo brushed off Ernest's complaints and refused to escalate them to HR.

129. Additionally, on one occasion in 2022, Gary physically grabbed Pemberton, forcing Pemberton to wrench herself free.

130. Pemberton was so shaken and upset by Gary's assault that she needed to leave her shift early to go home.

131. Gary never physically accosted the non-African-American employees.

132.    Upon information and belief, In or around December 2022, Palumbo involuntarily separated from employment with Paris Cafe.

133.    After Palumbo's forced departure from Paris Cafe, Ernest was hopeful that some of the discriminatory conduct would be remediated; however, this did not happen.

134.    Ernest and Pemberton continually subjected to disparate treatment and abuse after Palumbo's departure.

135.    Additionally, a petition was circulated to bring Palumbo back as Paris Cafe's General Manager, which was signed by nearly all of Paris Cafe's non-African American employees.

136.    After Palumbo's departure, Russo continued to single out Ernest and Pemberton for abuse.

137.    On or around December 2, 2022, Russo did not timely fire the food for one of Ernest's tables, causing the customers a delay in receiving their meal.

138.    Although Ernest had no responsibility for—or involvement in—Russo's failure to timely fire the food, Russo excoriated Ernest, ranting about her supposed failures.  Russo then falsely told the new Manager, Syed [last name currently unknown] ("Syed"), that Ernest was responsible for the delay.  When Syed approached Ernest and relayed what Russo had told him, Ernest explained to Syed that Russo's explanation was completely false and that she and Pemberton had long-running issues with how Russo treated them worse than the other Paris Cafe servers.  Ernest told Syed that her repeated requests to Palumbo to bring their complaints to HR were rebuffed and that she felt I had no choice but to reach out to HR herself.

139.    On or around December 2, 2022, Ernest contacted HR to complain of the race-and color-based discriminatory conduct to which she and Pemberton had been subjected.

140. HR scheduled a meeting with Ernest and Pemberton, to take place on December 12, 2022.

141. During the period after Ernest called HR but before the scheduled meeting, Russo again screamed at Ernest for an issue in which Ernest played no role.

142. On that occasion, a customer contacted Syed to complain about food poisoning. Although food poisoning is almost certainly caused by the kitchen—not service staff, when Russo learned about the call, he erupted at Ernest.

143. Screaming, Russo verbally assaulted Ernest for the food poisoning incident, publicly humiliating her just days after she had complained to HR about Russo's discriminatory conduct.

144. Russo never screamed at any of the non-African-American employees, even when they made significant mistakes.

145. Russo's abusive treatment of Ernest—who played no role in the food poisoning incident—greatly contrasted with his treatment of non-African-American employees who actually made mistakes or otherwise acted wrongly.

146. On December 12, 2022, Ernest and Pemberton met with Don Cordova ("Cordova"), Senior HR Director, and John [last name currently unknown] ("John"), an HR representative, at Bobby Van's Grill—another Tastes on the Fly restaurant.

147. John attended the meeting in person, and Cordova appeared via videoconference, which Cordova indicated was recorded.

148. During the meeting, Ernest and Pemberton detailed their complaints of the discriminatory conduct they had been enduring at Paris Cafe and, in particular, the mistreatment to which they had been subjected by Palumbo and Russo.

149.   Specifically, Ernest and Pemberton complained about Palumbo discriminatorily taking away their shifts and not posting their positive customer reviews, Gary reassigning Ernest's regular guest to Chen—along with the fallout, and the disparate abuse to which Ernest and Pemberton were subjected by Russo.

150.   Ernest informed Cordova and John that they wanted to raise their complaints with HR sooner, but they did not because they were afraid of retaliation.

151.   John responded that Ernest should not have been issued a write-up when she complained about Chen.

152.   Ernest told John that she had anxiety going into work, and John concluded the meeting by telling Ernest and Pemberton that they would "take care of everything".

153.   Despite HR's assurances, Ernest continued to be subjected to discriminatory treatment at Paris Cafe.

154.   After Ernest and Pemberton's meeting with HR, Russo further discriminated and retaliated against Ernest.

155.   In addition to continuing to single out the African-American servers for criticism and verbal abuse, Russo tried to facilitate Ernest's termination.

156.   On one occasion, Syed asked Ernest to train a newly hired server.

157.   Syed asking Ernest to train a newly hired server reflected that he was pleased with Ernest's knowledge, performance, and work ethic.

158.   Ernest asked Syed if she could begin training the employee the following day, as she was serving a large party and was swamped with tables.

159.   Syed had no objection to Ernest's request and agreed.

160. Although Ernest's request was reasonable and granted without any dispute by her relevant supervisor, Russo—who had no legitimate reason to interfere with an entirely front-of-the-house situation—reported to Mike Leonard ("Leonard"), Ernest's new manager, that Ernest was insubordinate in relation to this interaction with Syed.

161. Notably, Syed did not complain that Ernest was insubordinate, because my response and request were so unremarkable that there were no legitimate grounds for construing Ernest's response as insubordinate.

162. Russo's report to Leonard that Ernest was insubordinate was false and was made in retaliation for Ernest's complaints against Russo to HR.

163. Leonard approached Ernest with Russo's accusation of insubordination towards Syed.

164. Once Ernest was able to ascertain the "incident" Leonard was referring to, Ernest explained to Leonard the entirely unremarkable interaction with Syed, the long history of Russo's discriminatory conduct towards Ernest, Ernest's complaint to HR about Russo's discriminatory conduct, and that Russo's false allegation of insubordination against Ernest was part of his campaign to engender her termination, in retaliation for her complaints of discrimination to HR.

165. Ernest was not disciplined for the false allegation Russo made against her; however, neither Leonard, nor anyone at Paris Cafe, disciplined Russo for his overtly discriminatory and retaliatory conduct.

166. By August 2023—for apparently unrelated reasons—both Leonard and Russo were no longer employed by Paris Cafe.

167.    In or around late-August or early-September 2023, Tastes on the Fly transferred Ramnarine from Bobby Van's Grill to Paris Cafe, to serve as Paris Cafe's General Manager.[1]

168.    At the time Sam was transferred to Paris Cafe, Paris Cafe knew that a Bobby Van's employee had complained that Ramnarine had made racially discriminatory comments about African-American employees.

169.    Terry Burrus ("Burrus"), an African-American employee, had worked with Ramnarine at Bobby Van's Grill prior to Burrus' transfer.

170.    On or about September 6, 2022, while Burrus and Ramnarine were working at Bobby Van's Grill, Burrus complained to Corey Sims—a manager—that Ramnarine complained that Bobby Van's Grill was becoming a **"Black show"**, disparagingly referring to the number of African-American employees at the restaurant.

171.    Upon information and belief, the Bobby Van's Grill and Paris Cafe restaurants operated under the same HR department and shared other resources, including personnel, who were transferred to and from each restaurant as needed.

172.    Upon further information and belief, HR did not conduct any investigation, and no disciplinary action was taken against Ramnarine, as a result of Burrus' complaint.

173.    Knowing Burrus had previously worked with Ramnarine, Ernest asked Burrus about the incoming General Manager.

174.    Burrus told Ernest that Ramnarine did not like African-Americans and related to Ernest the comment Ramnarine made about African-American employees at Bobby Van's Grill.

---

[1] Upon information and belief, Ramnarine's brother, Joe (a nickname), had recently transferred from Bobby Van's Grill to Paris Cafe because Ramnarine could not supervise Joe at Bobby Van's. Upon further information and belief, shortly after Joe's transfer to Paris Cafe, Joe was terminated for bringing customers up to the TWA Hotel rooms.

175. Burrus further confirmed to Ernest that she complained about Ramnarine's comment.

176. Ernest was alarmed, as it was evident her new supervisor did not like African-Americans and that Paris Cafe transferred her to be the restaurant's General Manager despite knowing about Ramnarine's racial animosity.

177. Ernest's alarm was well justified, as Ramnarine subjected her to heinous, outrageous discrimination upon becoming her supervisor at Paris Cafe.

178. Within approximately one week of Ramnarine's transfer to Paris Cafe, Burrus was terminated, eliminating one of the few African-American employees at Paris Cafe.

179. On October 25, 2023, Ernest, after having finalized the bill for her table, realized that the customers she was serving were entitled to a discount. Ernest approached Ramnarine and asked her to help apply the discount, and they sat down at the computer to apply the discount. Because the checks had been separated, Ramnarine asked Ernest which check she should apply the discount to.

180. Before Ernest could respond, Ramnarine said to her, **"Eeny, meeny, miny, moe, catch a n\*gger by the toe!"**

181. Ernest was shocked and appalled, stunned into silence by Ramnarine's virulent, unvarnished racism.

182. The next day, Ernest complained about Ramnarine's racist comment to Jadine—who was then Ernest's supervisor and Ramnarine's subordinate.

183. Jadine indicated there was nothing she could do, as Ramnarine was her supervisor and—as General Manager—held the highest title at the restaurant.

184. Jadine encouraged Ernest to report her complaint to HR.

185. On October 27, 2023, Ernest complained to HR about Ramnarine's comment.

186. Ernest called John, recounted Ramnarine's egregiously racist comment, and said she did not want to work or speak with Ramnarine.

187. John responded that he would investigate and promised Ernest that she would not have to work or speak with Ramnarine.

188. Despite John's assurances, Ramnarine interacted with Ernest on multiple occasions after her complaint.

189. The next shift that Ernest worked after her complaint, Ernest saw Ramnarine at the restaurant, taking inventory.

190. On multiple occasions, Ramnarine went out of her way to confront Ernest, mockingly saying 'hello'.

191. On another occasion, when Ernest's mother was ill, Ramnarine called Ernest to discuss scheduling.

192. Additionally, Ramnarine spread a false rumor among the Paris Cafe employees that, Ernest, Pemberton, and Jadine—three African-American employees—teamed up to get Ramnarine fired so that Jadine could take her position.

193. These false rumors persist to this day and have hurt Ernest's relationship with her coworkers.

194. Ernest has suffered significant stress and discomfort as a result of the post-complaint interactions with Ramnarine and the false rumors Ramnarine spread about the African-American employees scheming to cause Ramnarine's termination for Jadine's benefit.

195. In early November 2023, John called Ernest and asked her, **"How many minorities did you tell about this situation [referring to Ramnarine's comment]?"**

196.    Ernest was taken aback by John's wildly inappropriate question and focus on "minorities".

197.    Ernest informed John that she told Jadine and Pemberton about Ramnarine's comment.

198.    In or around Thanksgiving 2023, Vice President of Business Operations Cassie Corless ("Corless"), met with Ernest to discuss her complaint about Ramnarine's comment.

199.    Ernest explained that she was extremely upset and expressed that what she experienced was not "okay".

200.    Shortly after the meeting—**a month after Ramnarine said the "n-word" to Ernest**—Paris Cafe finally terminated Ramnarine.

201.    That it took Paris Cafe a month to terminate Ramnarine after she said the word **"n*gger"** to Ernest, having already been aware of **another** racist comment from Burrus' complaint not long before, is reflective of Paris Cafe's causal attitude towards the rampant racial discrimination pervasive throughout the restaurant.

202.    This attitude extended to HR.

203.    In or around January 2024, Cha asked Jadine if she, Ernest, and Pemberton are Muslims.

204.    Cha had no reason to believe Ernest, Jadine, or Pemberton were Muslim, other than that they are Black and African-American.

205.    Upon information and belief, Cha was issued a write-up for this overtly discriminatory question; however, no discipline was imposed on Cha.

206.    Cha's nakedly discriminatory question, in addition to John asking Ernest how many "minorities" she told about Ramnarine's comment, reflects an atmosphere of discrimination within HR itself.

**Battery and Further Retaliation**

207.    In addition to the aforementioned rampant discriminatory abuse and retaliation, Ernest was subjected to a violent physical assault by her coworker, which Paris Cafe—in further retaliation against her for her multiple complaints of discrimination—failed to appropriately address.

208.    On January 14, 2024, Ernest was working a shift at Paris Cafe, when a group of potential customers approached the front of the restaurant, where she was standing. The customers asked Ernest if Paris Cafe served breakfast. Ernest replied that Paris Cafe's breakfast service had ended and asked them if they would like to see a menu. During this interaction, the host, Yenin Carrion ("Carrion"), became increasingly upset that Ernest—and not she—was speaking to the customers. As Ernest reached to hand the customers a menu, Carrion grabbed Ernest's wrist, violently twisted her arm behind her back, and screamed in Ernest's face.

209.    Carrion intentionally grabbed Ernest's wrist and twisted her arm behind her back without Ernest's consent.

210.    Ernest began crying, as she was extremely shocked, scared, and in pain.

211.    Ernest, rather than respond with aggression or violence, tried to find Head Chef, Bishow [last name currently unknown] ("Bishow") to report the assault.

212.    After unsuccessfully attempting to locate Bishow, Ernest immediately reported the assault to Syed and John via separate telephone calls.

213.    During her call with John, Ernest explained how Carrion assaulted her and that she felt scared of Carrion.

214.    John told Ernest that HR would review the security tape and let her know what would happen.

215.    John's response lacked urgency, reflecting his indifference to the assault Ernest experienced and to the immediate danger she felt from Carrion.

216.    Ernest indicated that she wished to report the assault to Port Authority Police.

217.    John, alarmed, strongly discouraged Ernest from calling the police, asking her, **"Are you *sure* that's really what you want to do?"**

218.    Distressed by Ernest's request to involve the police, John—defensively and without having viewed any surveillance footage of the assault—**tried to blame Ernest for being the victim of Carrion's assault**.

219.    Specifically, John reprimanded Ernest for standing at the host's station in the lead-up to the assault.

220.    Ernest was extremely upset that Paris Cafe was forcing her to defend herself, when she was the clear victim of an assault.

221.    Ernest explained to John that she just happened to be in the host's area and answered a potential customer's question, trying to persuade the customer to dine at Paris Cafe by showing them a menu—none of which was in any way unusual or out of the ordinary from her regular interactions with customers or potential customers.

222.    John asked Ernest if she wanted to go home for the day.

223.    Ernest responded that she did not want to go home, because she was scheduled to work a double shift, which—if she went home—would leave Paris Cafe short-staffed.

224. Ernest requested that Carrion be sent home for the remainder of her shift.

225. John denied Ernest's request.

226. John told Ernest that Carrion would finish her shift and that he would investigate the assault when he was next working—two days later.

227. John asked Ernest to send him a photograph of her injuries, which she did as soon as their call ended.

228. The photograph of Ernest's wrist shows the redness, swelling, and scratches caused by Carrion's assault.

229. Because John refused to send Carrion home, if Ernest did not take any further action, she would be forced to work the rest of her shift with Carrion.

230. After her call with John, Ernest was in fear for her safety and had no confidence that Paris Cafe would protect her.

231. Ernest wanted Carrion escorted off the premises so that she did not have to fear further physical violence or confrontation from Carrion.

232. Because Paris Cafe would not remove Carrion, Ernest felt she had no choice but to call the police, despite John's strong discouragement.

233. Ernest called the Port Authority Police to report the assault and also raised her safety concerns with TWA Hotel management.

234. A representative from TWA Hotel security, Terrence [last name currently unknown] ("Terrence"), reviewed the surveillance footage of Carrion's assault of Ernest.

235. Terrence informed Ernest that the surveillance footage confirmed her recounting of the assault.

236. As a result, TWA Hotel security escorted Carrion off the premises.

237.    When Port Authority Police followed up with Ernest, Ernest told the police that she did not need them to respond, as she was satisfied resolving the incident with Carrion's removal from the premises.  Ernest further told the police that she did not want Carrion arrested.

238.    After Carrion was escorted from the premises by TWA Hotel security, Bishow told Ernest that both she and Carrion would have to provide statements about the assault to HR.

239.    Ernest responded that she was glad to provide Paris Cafe with a statement about the assault, on the condition that she could provide her statement directly to Corless.

240.    Ernest indicated that she would only provide a statement directly to Corless because of John's skeptical response to her initial complaint.

241.    Over the next several days, Ernest repeatedly asked Cha for Corless' email or phone number, so that she could provide Corless with her statement.

242.    Cha refused to provide Ernest with Corless' contact information.

243.    As a result, Ernest was unable to give Paris Cafe her statement of the assault.

244.    Since the assault, no one from HR contacted Ernest in connection with any investigation.

245.    Upon information and belief, Paris Cafe has spoken with Carrion about the assault.

246.    Paris Cafe's usual procedure was to immediately intervene to address physical altercations between employees, including less severe physical altercations than Carrion's assault of Ernest.

247.    By way of example, a few months before Carrion assaulted Ernest, Paris Cafe **immediately** removed Jamal Mills ("Mills"), a former African-American employee, because he poked another South Asian employee, Hussein, on the upper shoulder.

248.    Although the incident between Mills and Hussein involved substantially less contact (and, upon information and belief, no injury), Paris Cafe immediately escorted Mills off the premises, suspended him pending investigation, and, very shortly thereafter, terminated him.

249.    Pursuant to these procedures, Carrion's assault of Ernest required immediate action by Paris Cafe.

250.    However, despite Ernest's request for Carrion to be sent home for the day and the visible injuries to Ernest's wrist which were contemporaneously provided to HR, Paris Cafe refused to send Carrion home after she grabbed Ernest's wrist and violently twisted it behind her back, leaving scratches and causing swelling and redness.

251.    Following the assault, Carrion continued to be employed by Paris Cafe.

252.    Upon information and belief, Carrion was not disciplined for assaulting Ernest.

253.    Upon information and belief, Carrion later voluntarily left employment with Paris Cafe.

254.    Although Ernest's prior complaints of discrimination were corroborated and substantiated, Paris Cafe was reticent to assist Ernest after she had been physically assaulted because of her numerous complaints about the unlawful discriminatory conduct to which she was subjected.

255.    Further, Bailey continues to discriminate against Ernest and retaliate against her for her complaints of discrimination to HR and management.

256.    By way of example, Bailey continues to make false representations to Paris Cafe management and coworkers about Ernest's job performance, to attempt to have Ernest disciplined and engender her termination.

257. Despite Ernest's complaints, she is forced to continue working with Bailey on a regular basis.

258. Defendants discriminated against Ernest on the basis of her race and color.

259. Defendants subjected Ernest to a discriminatory hostile work environment on the basis of her race and color.

260. Defendants' discriminatory conduct created a hostile work environment for Ernest which no reasonable person could be expected to tolerate.

261. The discriminatory acts to which Ernest was subjected by Defendants during her employment were severe and pervasive.

262. Defendants subjected Ernest to inferior terms, conditions, and privileges of employment on account of her race and color.

263. Defendants treated Ernest less well than others on the basis of her race and color.

264. During her employment with Paris Cafe, Ernest complained of and opposed Defendants' unlawful discriminatory conduct.

265. After and as a result of Ernest's complaints of and opposition to Defendants' unlawful discriminatory conduct, Defendants retaliated against Ernest.

266. Defendants discriminated against Ernest by forcing her tolerate (and refusing to remediate) race- and color-based discriminatory practices towards customers, subjecting her to outrageous and offensive comments and conduct on the basis of her race and color, fostering, condoning, and failing to remediate the discriminatory hostile work environment, cutting shifts from her (and other African-American employees) to provide to non-African-American employees, forcing Ernest to continue working with and subject to the supervision of her harassers,

and disparately refusing to apply policies and/or procedures to protect her safety after she was assaulted by a coworker.

267. Defendants retaliated against Ernest after and as a result of her complaints of and opposition to Defendants' discriminatory conduct by failing to remediate the discriminatory conduct, fostering an increasingly hostile work environment in response to her opposition to and complaints of discrimination, forcing Ernest to continue working with and subject to the supervision of her harassers, and disparately refusing to apply policies and/or procedures to protect her safety after she was assaulted by a coworker.

268. Palumbo, by actually participating in the discriminatory and retaliatory conduct to which Ernest was subjected, by condoning and failing to remediate his discriminatory conduct when Ernest voiced her opposition, and by refusing to escalate Ernest's complaints of discrimination to HR, aided and abetted the discriminatory and retaliatory conduct to which Ernest was subjected.

269. Ramnarine, by actually participating in the discriminatory and retaliatory comments and conduct to which Ernest was subjected and by condoning and failing to remediate her discriminatory conduct when Ernest voiced her opposition, aided and abetted the discriminatory and retaliatory conduct to which Ernest was subjected

270. Defendants' actions and conduct were and are intentional and intended to harm Ernest.

271. Defendants have caused damage and injury to Ernest by subjecting Ernest to discrimination and a hostile work environment and then again by retaliating against her after and because she complained of and opposed Defendants' unlawful discriminatory conduct.

272.    As a result of Defendants' unlawful discriminatory and retaliatory conduct, Ernest was humiliated, demeaned, and belittled, and Ernest suffers and continues to suffer a loss of rights, emotional distress, loss of income, and earnings.

273.    As a result of Defendants' discriminatory and retaliatory treatment, Ernest suffered and continues to suffer severe emotional distress.

274.    As a result of the acts and conduct complained of herein, Ernest has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits, and other compensation which such employment entails, and Ernest has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

275.    As Defendants' conduct has been willful, reckless, outrageous, intentional, and/or malicious, Defendants are liable to Ernest for punitive damages.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of Title VII
### (As to Defendant Paris Cafe only)

276.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

277.    By the actions described above, among others, Defendants have discriminated against Plaintiff because of her race and color, in violation of Title VII

278.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### Hostile Work Environment in Violation of Title VII
### (As to Defendant Paris Cafe only)

279.     Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

280.     By the actions described above, among others, Defendants have discriminated against Plaintiff and created a hostile work environment because of her race and color, in violation of Title VII.

281.     As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## THIRD CAUSE OF ACTION
### Retaliation in Violation of Title VII
### (As to Defendant Paris Cafe only)

282.     Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

283.     By the actions described above, among others, Defendants have retaliated against Plaintiff in violation of Title VII, after and because she engaged in protected activity.

284.     As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## FOURTH CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL
### (As to all Defendants)

285.     Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

286.     By the actions described above, among others, Defendants have discriminated against Ernest on the basis of her race and color, in violation of the NYSHRL.

287.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**FIFTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the NYSHRL**
**(As to all Defendants)**

288.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

289.    Executive Law § 296 provides for a hostile work environment claim where an employee shows that she was subjected to, "inferior terms, conditions or privileges of employment because of [her] membership in one or more . . . protected categories.".

290.    By the actions described above, among others, Defendants have subjected Ernest to a discriminatory hostile work environment as a result of her race and color, in violation of the NYSHRL.

291.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**Retaliation in Violation of the NYSHRL**
**(As to all Defendants)**

292.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

293.    By the actions described above, among others, Defendants have retaliated against Ernest after and because she engaged in protected activity.

294.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## SEVENTH CAUSE OF ACTION
### Discrimination in Violation of the NYCHRL
### (As to all Defendants)

295.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

296.    By the actions described above, among others, Defendants have discriminated against Ernest on the basis of her race and color, in violation of the NYCHRL.

297.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the NYCHRL
### (As to all Defendants)

298.     Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

299.    Pursuant to the New York City Administrative Code, an employee can establish a hostile work environment claim if she can show that she was treated less well than other employees because of her protected class.

300.    Defendants treated Ernest less well because of her race and color.

301.    By the actions described above, among others, Defendants subjected Ernest to a hostile work environment on the basis of her sex/gender, in violation of the NYCHRL.

302.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

### NINTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL
### (As to all Defendants)

303.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

304.    Pursuant to the New York City Administrative Code, it is an unlawful discriminatory practice for any person to retaliate or discriminate in any manner against any person because such person has complained of or opposed the discriminatory practices prohibited by the NYCHRL.

305.    By the actions described above, among others, Defendants have retaliated against Ernest in violation of the NYCHRL after and because she engaged in protected activity.

306.    As a direct and proximate result of Defendants' unlawful discriminatory conduct, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

### TENTH CAUSE OF ACTION
### New York State Common Law Battery
### (As to Defendant Paris Cafe only)

307.    Plaintiff Ernest repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

308.    Under New York State common law, civil battery is defined as a non-consensual, harmful or offensive physical contact resulting in harm or offense.

309.    At all times relevant to this action, Carrion was an employee of Paris Cafe.

310.   In furtherance of Carrion's employment with Paris Cafe, Carrion intentionally grabbed Ernest's wrist and twisted her arm behind her back without Ernest's consent.

311.   As a direct and proximate result of the unlawful battery for which Paris Cafe is liable, Ernest has suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A. Declaring that the practices complained of herein are unlawful under applicable federal, state, and municipal law;

B. Declaring that Defendants' violated Title VII, NYSHRL, and NYCHRL by discriminating against Plaintiff and subjecting Plaintiff to a discriminatory hostile work environment, on the basis of her race and color and awarding a recovery for damages sustained;

C. Declaring that Defendants' violated Title VII, NYSHRL, and NYCHRL by retaliating against Plaintiff after and because she complained of or opposed Defendants' discriminatory conduct and awarding a recovery for damages sustained;

D. Declaring that Paris Cafe is liable to Plaintiff for unlawful battery and awarding a recovery for damages sustained;

E. Directing Defendants to place Plaintiff in the in the position she would have occupied but for Defendants' discriminatory and otherwise unlawful conduct and making Plaintiff whole for all earnings and other benefits she would have received but for Defendants' discriminatory and unlawful treatment, including, but not limited to, title, seniority status, wages and other lost benefits;

F. Awarding Plaintiff compensatory monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, and other benefits of employment, incurred as of result of Defendants' violations of Title VII, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

G. Awarding Plaintiff compensatory non-monetary and/or non-economic damages, including but not limited to compensation for mental anguish, humiliation, embarrassment, reputational harm, stress and anxiety, emotional and psychological

pain and suffering, emotional and psychological distress and the physical manifestations caused, incurred as a result of Defendants' violations of Title VII, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus prejudgment interest;

H. Awarding Plaintiff punitive damages for Defendants' violations of Title VII, NYSHRL, and NYCHRL, in an amount to be determined at trial, plus pre-judgment interest;

I. Awarding Plaintiff prejudgment and post-judgement interest, retroactive to the date the damages accrued, under Title VII, NYSHRL, and NYCHRL;

J. Awarding Plaintiff reasonable attorney's fees, costs, and expenses of the action under Title VII, NYSHRL, and NYCHRL;

K. Awarding such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury.

Dated: December 11, 2024
         New York, New York

Respectfully submitted,

**Akin & Salaman PLLC**

*/s/ Justin Ames*

_____
Justin Ames

45 Broadway, Suite 1420
New York, NY 10006
Telephone:  (212) 825-1400
Facsimile:   (212) 825-1440
justin@akinlaws.com
*Counsel for Plaintiff*